## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| JAMES DAVID YURMAN,<br><br>                          Plaintiff,<br><br>vs.<br><br>PLATO LEARNING, INC, VINCENT P. RIERA, DAVID W. SMITH, STEVEN R. BECKER, MATTHEW A. DRAPKIN, SUSAN E. KNIGHT, JOHN G. LEWIS, M. LEE PELTON, ROBERT S. PETERKIN, and J. TED SANDERS,<br><br>                          Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

**CASE NO.: _____**

**PLAINTIFF'S SHAREHOLDER COMPLAINT FOR VIOLATIONS OF §14(a) AND §20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.      This is an individual stockholder action brought by a holder of the common stock of PLATO Learning, Inc. ("PLATO" or the "Company") against the Company and the members of the Company's Board of Directors (the "Board" or the "Individual Defendants") arising out of their violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder in connection with the dissemination of a false and materially misleading proxy statement in connection with the proposed merger ("Proposed Merger") of the Company with Thoma Bravo, LCC ("Thoma Bravo").

2.      The Proposed Merger itself is the product of an unfair sales process that seeks to divest the Company's public shareholders of their valuable investment in the Company at an unfair price. In an attempt to secure shareholder support for the unfair Proposed Merger, on April 5, 2010, the Company issued a materially false and misleading Schedule 14A Preliminary Proxy Statement

(the "Proxy"). The Proxy, which recommends that PLATO's shareholders vote in favor of the Proposed Merger, omits and/or misrepresents material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Merger, and the actual intrinsic value of the Company's assets both as stand-alone entity and as a merger partner for Thoma Bravo. Specifically, the Proxy omits and/or misrepresents the following material information in contravention of §§14(a) and 20(a), including (a) why Defendants drastically limited the auction process to five financial buyers and no strategic buyers, despite the fact that the Company has recently completed its successful strategic transition and has been experiencing record growth; (b) what steps, if any, Defendants took in performing their "market check" that led them to rely upon an auction process undertaken - and then abandoned - more than two years earlier when the Company was differently positioned; ( c) why Defendants ceased negotiations with a financial bidder offering to buy PLATO at a higher price than Thoma Bravo; and (d) the fundamentally flawed methods and analyses underlying the fairness opinion provided to the Individual Defendants and the Special Committee by its financial advisor, Craig-Hallum Capital Group LLC ("Craig-Hallum").

3.      As explained herein, the foregoing information is material to the impending decision of the Company's shareholders whether to vote in favor of the Proposed Merger. As such, Defendants' violations of §§14(a) and 20(a) threaten shareholders with irreparable harm for which money damages are not an adequate alternate remedy. Thus, Plaintiff seeks injunctive relief to ensure that Defendants cure their violations of §§14(a) and 20(a) before the Company's shareholders are asked to vote on the Proposed Merger, and that Defendants are not permitted to seek shareholder support of the Proposed Merger without complying with their duty under the federal securities laws to provide shareholders with all material information about the sales process, the Proposed Merger consideration, and the Company's intrinsic value.

2

## JURISDICTION AND VENUE

4.       This Court has jurisdiction over all claims asserted herein pursuant to §27 of the 1934 Act for violations of §§14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

5.       Venue is proper in this District because PLATO has its principle place of business in this District. Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court. Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts with this District.

## PARTIES

6.       Plaintiff James David Yurman has been a shareholder of PLATO at all times relevant hereto, and continues to be a shareholder of PLATO.

7.       Defendant PLATO is a Delaware corporation with its principal office at 10801 Nesbitt Avenue South, Bloomington, Minnesota 55437. The Company has offices throughout the United States, Canada, and Puerto Rico, as well as international distributors in the United Kingdom and South Africa. PLATO is a provider of education technology solutions for K-adult learners, offering curricula for reading, writing, mathematics, science, social studies, and life and job skills. The foundation of all PLATO products are the PLATO Learning Environment ("PLE"), which provides internet-based, anytime/anywhere access to PLATO products or its precursor, and the classic PLATO Web Learning Network ("PWLN"). PLATO offers standards-based elementary, secondary, and post-secondary teaching and learning options covering the entire spectrum of

academic needs—from remediation and credit recovery to teacher-centric solutions for the mainstream classroom, from career preparation to trend-forward distance learning options.

8.      Defendant Vincent P. Riera ("Riera") currently serves as President and Chief Executive Officer of PLATO. Riera became President and CEO in November 2008 after serving as the Company's Senior Vice President of Sales and Services for almost two years. Riera will benefit from the Proposed Merger because he will receive $2,183,053 in exchange for his vested stock options, stock appreciation rights, restricted stock units, and the lapse of restrictions on his 9,000 shares of PLATO restricted stock. Riera has also entered into an employment agreement pursuant to which he will continue to serve as President and Chief Executive Officer of the Company for two years beginning on the date of the close of the Proposed Merger. Riera's salary, which is $390,000 per year, will not be reduced, and he will be entitled to a lump sum cash bonus equal to twice his annual salary in effect at the end of two years if he continues in his position for that period of time. If Riera's employment is terminated within the two year period after the Proposed Merger, he will be entitled to a lump sum severance payment equal to twice his annual salary in effect at the time of termination and will retain health and welfare benefits for 18 months after his termination. Pursuant to a Leadership Incentive Plan established in 2009, Riera also will be entitled to a lump sum cash payment of $200,000 in connection with the consummation of the Proposed Merger and is entitled to a pro-rated cash incentive payment with a target of $234,000 for fiscal year 2010.

9.      Defendant David W. Smith ("Smith") has served as a director of the Company since April 2004 and was the Chair of the Special Committee that considered the Proposed Merger. Smith will benefit from the Proposed Merger because he will receive $139,100 in exchange for his vested stock options, stock appreciation rights, restricted stock units, and the lapse of restrictions on his 4,000 shares of PLATO restricted stock.

4

10.     Defendant Steven R. Becker ("Becker") currently serves as a director of PLATO and as a member of the Nominating and Governance Committee and Compensation Committee.  Becker will benefit from the Proposed Merger because he will receive $111,650 in exchange for his vested stock options, stock appreciation rights, restricted stock units, and the lapse of restrictions on his 2,000 shares of PLATO restricted stock.

11.     Defendant Matthew A. Drapkin ("Drapkin") currently serves as a director of PLATO and as a member of its Audit Committee.  Drapkin has served as a director of the Company since March 2009 and was a member of PLATO's Special Committee that considered the Proposed Merger. Drapkin will benefit from the Proposed Merger because he will receive $111,650 in exchange for his vested stock options, stock appreciation rights, restricted stock units, and the lapse of restrictions on his 2,000 shares of PLATO restricted stock.

12.     Defendant Susan E. Knight ("Knight") has served as a director of the Company since September 2005 and was a member of the Special Committee that considered the Proposed Merger. Knight will benefit from the Proposed Merger because she will receive $116,800 in exchange for her vested stock options, stock appreciation rights, restricted stock units, and the lapse of restrictions on her 5,000 shares of PLATO restricted stock.

13.     Defendant John G. Lewis ("Lewis") has served as a director of the Company since September 2008. Lewis will benefit from the Proposed Merger because he will receive $103,250 in exchange for his vested stock options, stock appreciation rights, restricted stock units, and the lapse of restrictions on his 2,000 shares of PLATO restricted stock.

14.     Defendant M. Lee Pelton ("Pelton") has served as a director of the Company since September 2005. Pelton will benefit from the Proposed Merger because he will receive $110,800 in

exchange for his vested stock options, stock appreciation rights, restricted stock units, and the lapse of restrictions on his 5,000 shares of PLATO restricted stock.

15.     Defendant Robert S. Peterkin ("Peterkin") has served as a director of the Company since September 2006. Peterkin will benefit from the Proposed Merger because he will receive $105,200 in exchange for his vested stock options, stock appreciation rights, restricted stock units, and the lapse of restrictions on his 4,000 shares of PLATO restricted stock.

16.     Defendant J. Ted Sanders ("Sanders") has served as a director of the Company since September 2003.  Sanders will benefit from the Proposed Merger because he will receive $123,220 in exchange for his vested stock options, stock appreciation rights, restricted stock units, and the lapse of restrictions on his 5,000 shares of PLATO restricted stock.

17.     Thoma Bravo, LLC is a Limited Liability Company with its principal office in Chicago, Illinois at 9200 Sears Tower, Chicago, Illinois 60606.  Thoma Bravo is a private equity firm that provides equity, as well as strategic and operating support to businesses and their management teams.  Thoma Bravo invests in many industries, but particularly in software, business and financial services, education, and other consolidating industry sectors.

18.     Project Porsche Holdings Corporation ("the Parent") is a Delaware corporation, with its principal executive offices located at 600 Montgomery Street, 32nd Floor, San Francisco, CA 94111.  The Parent was formed in anticipation of the merger by an investment fund affiliated with Thoma Bravo.  Upon completion of the merger, PLATO would be a wholly owned subsidiary of the Parent.

19.     Project Porsche Merger Corp. ("Merger Sub") is a Delaware corporation, with its principal executive offices located at 600 Montgomery Street, 32nd Floor, San Francisco, CA 94111.  Merger Sub was formed by the Parent in anticipation of the merger.  Merger Sub is a wholly owned

subsidiary of the Parent. Pursuant to the Merger Agreement, upon the Merger, Merger Sub would merge with and into PLATO and PLATO would continue as the surviving corporation.

20.     Defendants named in paragraphs 8 through 16 are referred to herein as "Individual Defendants," or the "Board."

21.     Thoma Bravo, Parent, and Merger Sub are referred to herein as "Thoma Bravo."

## BACKGROUND TO DISSEMINATION OF THE
## MATERIALLY MISLEADING PROXY

22.     In 2005, PLATO began an important strategic transition, in which the Company sought to shift its core business from the sale of one-time perpetual licensed educational software to the sale of subscription-based educational products delivered over the Internet.

23.     According to PLATO's annual report on Form 10-K filed with the SEC on January 12, 2007, the Company was "strategically transitioning [its] business model from one that emphasized the sale of one-time perpetual licenses to [its] software . . . to one that emphasizes the sale of subscription-based products. . . ." PLATO warned investors that this transition had suppressed its revenue and would make its financial results unpredictable.

24.     Beginning in 2005, PLATO successfully executed its plan by decreasing the Company's reliance on license fee-based revenues while increasing its subscription-based revenues.

25.     Although PLATO's transition to online subscription-based content initially impacted the Company's revenues, its plan ultimately proved successful. In its 2009 Form l0-K, the Company announced that the transition was complete: "At the end of fiscal year 2008, we completed our transition to a software-as-a-service business model in which substantially all of our products are now delivered on a hosted, subscription service basis." This software-as-a-service model is particularly significant in defining the Company's comparable company universe.

26.     As a result of the transition, PLATO was able to dramatically decrease its operating expenses.

27.     As a result of these efficiencies, PLATO's earnings before interest, taxes, depreciation and amortization ("EBITDA"), which declined approximately 61% in 2007, has increased dramatically since that time.    In 2008, the Company's EBITDA increased by approximately 590% to $5,355,000, compared to $776,000 in 2007.  And in 2009, the Company's EBITDA increased by approximately 156% to $13,710,000.

28.     Defendant Riera recognized PLATO's achievements in the Company's 2009 letter to its shareholders:

> Fiscal 2009 was a milestone year for PLATO Learning and our shareholders.  We began the transition to a Software-as-a-Service business model four years ago with the goal of transforming PLATO Learning into a company that could deliver consistent profitability and strong cash flows to our shareholders. In fiscal 2009, we achieved those goals by delivering our first full year of profitability and strong positive cash flow. Full year earnings were $957,000, or $0.04 per share, while we generated full year free cash flow of $8 million and ended the year with a cash balance of $28.2 million.

> Although 2009 was one of the worst economic environments in decades, with school districts losing funding at a rate they had never experienced before, PLATO Learning was able to deliver strong subscription order growth in fiscal 2009 and total order growth in every quarter. This speaks to the strength of the PLATO® products and their alignment to the most critical challenges facing school districts. Total orders for the year grew 12 percent to $80.7 million, driven by continued strong demand for our subscription-based products. Subscription orders grew 31 percent for the year, and orders for products delivered on the PLATO Learning Environment® (PLE®), our flagship SaaS platform, totaled nearly $50 million for the year-a 47 percent increase over fiscal year 2008.

This statement implies that PLATO should experience strong growth once the economy recovers. The Company's future growth prospects are thus an important consideration in any valuation analysis.

29.    PLATO's impressive growth is expected to continue into the future.  According to PLATO's February 25, 2010 Form 8-K, during the first quarter of 2010, the Company's subscription orders grew approximately 28%, with orders for PLE increasing by 37%.  Further, during the same quarter, the Company's deferred revenue *(i.e.,* billed subscription and services agreements that the Company expects to subsequently recognize as revenue) increased by approximately 20%.

30.    According to the Proxy, PLATO's Board retained a financial advisor in late spring 2007 to assist it in "pursuing strategic alternatives."  During the summer and fall of 2007, the financial advisor contacted approximately 60 financial buyers and 20 strategic buyers that the financial advisor and a special committee of the Board determined might have an interest in pursuing an acquisition of PLATO.  Of those contacts, approximately 25 financial buyers and 10 strategic buyers signed non-disclosure agreements and received an information memorandum regarding PLATO.  By late summer 2007, only seven financial buyers (and no strategic buyers) had indicated an interest in making a bid to acquire PLATO.  By November 2007, only one prospective buyer remained.  This prospect sent a letter of intent proposing to acquire PLATO at a price of $4.62 per share.  The offer was raised to $4.70 per share in December 2007.  However, the offer was withdrawn in February 2008. Defendants ultimately "abandoned [their] pursuit of strategic alternatives."

## THE PROPOSED MERGER

31.    On March 25, 2010, PLATO announced that it had entered into a definitive agreement, by and among the Company, Parent, and Merger Sub, pursuant to which Merger Sub would be merged with and into the Company, and as a result the Company would continue as the surviving corporation and as a wholly-owned subsidiary of Parent, which is controlled by Thoma Bravo. Pursuant to the Proposed Merger, each issued and outstanding share of common stock of the

Company, other than shares owned by the Company, Parent, or Merger Sub, would be cancelled and extinguished and automatically converted into the right to receive $5.60 in cash, without interest. The surviving corporation will be a privately held corporation in which PLATO's current stockholders will not have any ownership interest or rights as stockholders. As a result of the Proposed Merger, the Company's current stockholders will not participate in any future earnings or growth of the surviving corporation and will not benefit from any appreciation in value of the surviving corporation.

32.     The press release provided, in relevant part, as follows:

**PLATO Learning Enters into Merger Agreement with Thoma Bravo**
*Shareholders to receive $5.60 per share in cash; Merger valued at $143 million*
Minneapolis, MN (March 26, 2010) – PLATO Learning, Inc. (NASDAQ: TUTR), a leading provider of K-adult online learning solutions, today announced it has entered into a definitive agreement to be acquired by an affiliate of Thoma Bravo, LLC in a Merger valued at approximately $143 million. The PLATO Learning board of directors unanimously approved the agreement and will recommend that the Company's shareholders approve the Merger.

Under the terms of the agreement, PLATO Learning shareholders will receive $5.60 in cash for each share of PLATO Learning common stock they hold, representing a premium of approximately 30% over the Company's average closing price during the 30 trading days ending March 25, 2010 and a 34% premium over the Company's average closing price during the 90 trading days ending March 25, 2010.

"Our agreement with Thoma Bravo represents an attractive valuation for our shareholders, and we look forward to closing the Merger as quickly as possible," said Vin Riera, PLATO Learning's President and Chief Executive Officer. "We also look forward to partnering with Thoma Bravo in continuing to focus on delivering high quality PLATO Learning solutions to our customers."

"Thoma Bravo is excited to partner with PLATO Learning's existing management team to enhance the Company's growth and bring increased value to customers," said Holden Spaht, a Principal at Thoma Bravo. "PLATO's established solutions and experienced leadership team, coupled with Thoma Bravo's expertise in buying and building software companies, presents an excellent opportunity for PLATO to further strengthen its position within the education technology market."

The Merger is subject to customary closing conditions, including requisite regulatory approvals and approval of PLATO Learning shareholders. The Merger is not subject

to a financing condition. PLATO Learning expects the Merger to close in the Company's fiscal quarter ending July 31, 2010.

Thomas Weisel Partners LLC served as exclusive financial advisor to PLATO Learning, and Craig-Hallum Capital Group LLC provided a fairness opinion to the Company's Board of Directors.

33.     Thoma Bravo first approached PLATO with an "unsolicited offer" in mid-July 2009. Thereafter, PLATO management waited five months to identify only *four* other potential buyers, notably all financial buyers, with whom it discussed strategic initiatives. This sales schedule suggests that Thoma Bravo realized a significant time and due diligence advantage as subsequent potential buyers received significantly less time to conduct due diligence and value the Company, which may have impaired their respective valuations.

34.     Defendants support this wholly inadequate sales effort by asserting that "the special committee and the board of directors . . . desired to limit the overall numbers of participants in the process and the amount of time consumed by the process to reduce the disruption [PLATO's] business would suffer, especially given its experience as a result of the extensive scope of the 2007 strategic alternative process." However, their purported reliance upon the failed 2007 sales process is inexplicable, as the Company is in a dramatically different situation now than it was during 2007; at that time, PLATO was struggling to execute its new subscription-based business model which resulted in declining and unpredictable financial results. Indeed, in 2007 PLATO had been operating at a year-over-year loss and the Company was warning investors that it "may never become profitable." In contrast, by the first quarter of 2010, the Company had not only become profitable, but had experienced nearly 458% growth in operating income compared to the first quarter of 2009.

35.     Defendants stated that based on their experience in 2007, strategic buyers would not be interested in purchasing the Company. According to the Proxy: "The special committee and the board of directors considered possible acquirers of PLATO Learning, and determined that, based on

our prior experience and a review with [the financial advisor retained in connection with the Proposed Merger, Thomas Weisel Partners, LLC ("TWP")] of potential acquirers, the most likely acquirers would be financial buyers as the strategic buyers in our industry did not express interest in acquiring PLATO Learning either during the 2007 strategic alternatives process or after the conclusion of that process and did not have characteristics that would make stock consideration appealing to PLATO Learning's stockholders." The Board had no reasonable basis for assuming that potential strategic acquirers would only use stock consideration in the current environment. Nor did the Board explain why it concluded that certain types of consideration would be unappealing to PLATO's stockholders.

36.     Defendants determined not to seek bids from strategic buyers because of concerns "that allowing competitors to review [PLATO's] confidential and competitively sensitive information would damage [PLATO] and [its] prospects." However, a potential financial acquirer identified in the Proxy as "Party E" is a PLATO competitor and was allowed to participate in the process, with no detriment to PLATO's business (Party E signed appropriate confidentiality and non-solicitation agreements). The Proxy describes Party E as "a financial buyer with a portfolio company that is a competitor to us. . . ." Further, Defendants admit that in 2007, when the Company was in an even more vulnerable competitive position, they had contacted 20 strategic buyers and signed non-disclosure agreements with 10 strategic buyers.

37.     Further, Defendants imposed an extraordinarily strict timeline for due diligence on the other four parties invited to submit competing bids. In fact, on February 27, 2010, the Defendants excluded from further consideration the highest bidder, identified as "Party D," because that bidder had asked to conduct additional due diligence. According to the Proxy, on January 13, 2010, Party D "indicated orally that it would probably arrive at a price for PLATO that was more

than $6.00 per share." Then, on January 14, 2010, "Party D submitted a written indication of interest at a price of $6.50-7.00 per share."

38.     On February 8, 2010, Defendants "received bids from Party C at a price of $5.00 per share and no indication as to whether there would be a financing contingency, Thoma Bravo at a price of $5.50 per share with no financing contingency, and Party D at a price of $6.00 per share with no financing contingency."

39.     On February 26, 2010, "Party D reaffirmed its $6.00 per share price but provided a significant list of open due diligence." The next day, on February 27, 2010, the Board held a meeting during which members of the special committee "expressed their lack of faith that Party D would be willing to close the proposed Merger because Party D had initially offered a higher price that it subsequently reduced, had provided a significant list of additional due diligence items that it would need to review before entering into a definitive agreement and because Party D did not appear to understand [PLATO's] business as well as Thoma Bravo."

40.     Further, Defendants will personally benefit from the Proposed Merger with a financial buyer because they will retain their employment and receive millions of dollars. Indeed, on February 16, 2010, in the midst of the 2010 sales process during which management and the Board were legally required to seek the best price possible for PLATO shareholders, the Company entered into an eleven-year agreement to lease approximately 27,000 square feet of office space for corporate headquarters in Bloomington, Minnesota. The new lease expires on July 1, 2021. This decision reflects management's confidence that Thoma Bravo's plans for the Company would likely be consistent with management's current plan and that a relocation or elimination of the corporate headquarters would be unnecessary.

41.     Additionally, the termination fee agreed to by Defendants is also unfair.  In the event that another buyer for PLATO comes forward with a superior offer, the Company must pay a $5.8 million termination fee (less any amount previously paid in reimbursement of Merger expenses) to Thoma Bravo. This represents more than 4% of the equity value of the Company and nearly 5% of the enterprise value of the Company, an amount that is unduly oppressive and is not designed to provide Thoma Bravo with reasonable damages in the event of termination.  Instead, the primary purpose of this provision is to discourage offers that would be more favorable to PLATO's shareholders.

42.     Other terms of the Merger Agreement include a "no-shop" provision that unreasonably restricts the Company from soliciting superior proposals by, among other things, restraining its ability to communicate with potential buyers.  Specifically, the Board is prohibited from initiating or engaging in discussions and negotiations with potential buyers even if it believes that reaching out to a particular buyer could reasonably lead to an offer more closely aligned with the interests of PLATO's public shareholders.  It is inappropriate for Defendants to include such a provision in an all cash Merger for a Company that has not been adequately marketed.  In fact, it is far more appropriate for the target's board to have negotiated a "go-shop" provision to allow for a true "market-check."

43.     For example, on January 8, 2010, rather than conducting the negotiations and providing updates to PLATO management, the Special Committee "received an update on the strategic alternatives process from management . . ."  Likewise, nearly every Special Committee meeting noted in the Proxy acknowledges that management, the Board, or both, were present at most Special Committee meetings.  For example, "[o]n November 19, 2009, members of our management met with Mr. Smith [the chair of the Special Committee] to consider Thoma Bravo[']s letter"; on

December 4, 2009, "[t]he Special Committee *and* the [Board] considered possible acquirers of PLATO"; and "[o]n March 25, 2010, the Special Committee *and* Board held a meeting to discuss the proposed merger with an affiliate of Thoma Bravo" at which members of management and representatives of Craig-Hallum were present.

44.     Further, of the four members of the Special Committee, two of them are employees of Greenway Capital ("Greenway"), a private equity fund and PLATO's largest shareholder.  Prior to the first public announcement of the Proposed Merger, Greenway entered into a Voting Agreement with Thoma Bravo to vote its 17% interest in favor of the Proposed Merger.

45.     Moreover, Craig-Hallum's Fairness Opinion consists of a "Comparable Company Analysis," a "Comparable Merger Analysis," a "Premiums Paid Analysis," and a "Discounted Cash Flow Analysis."  Each of these analyses as described in the Proxy either supports the conclusion that the consideration provided is inadequate - the opposite of the opinion reached by Craig-Hallum - or was performed in such a manner or with such limited disclosure as to render them useless.  Further, it appears that Craig-Hallum used an "adjusted" definition of EBITDA for its Fairness Opinion which may be inconsistent with that used by its own analysts in their published research reports.  Specifically, it appears that Craig-Hallum reduced EBITDA by approximately $5.0 million to $6.0 million for capitalized software development costs and other expenses.  This reduction in EBITDA for purposes of the Fairness Opinion has the effect of inflating the implied multiple of EBITDA being paid by Thoma Bravo to 10.7x.  A calculation of Enterprise Value to LTM EBITDA, excluding the Craig-Hallum adjustment, would produce a significantly lower multiple and one which is not in line with the mean or median of either the comparable company analysis or the comparable Merger analysis.

46.     Craig-Hallum's Fairness Opinion excludes a leveraged buy-out analysis which is particularly relevant given the exclusively financial buyer universe approached by PLATO.

47.     Craig-Hallum's Fairness Opinion appears to exclude the value of the Company's net operating loss ("NOL") which, based upon conservative estimates, could be worth in excess of $1.00 per share.

48.     According to Craig-Hallum's own research analysts, "[a]fter a multi-year transition to a subscription model from a perpetual license model, we believe PLATO has turned the corner. The company is on the verge of sustainable revenue growth and strong operating leverage."

49.     As recently as February 25, 2010, Craig-Hallum analysts placed a $6.00 price target on PLATO shares, based on an 8.0x forward-looking EV/EBITDA multiple and a 1.9x forward-looking EV/revenue multiple.  The analysts' EBITDA and revenue multiples were based on projected fiscal year 2010 results.  Craig-Hallum's valuation represents a premium of 7% over Thoma Bravo's offer price of $5.60 per share (and may exclude the value of the Company's NOL and does not reflect any "control premium" that an acquirer of the entire Company might be expected to pay).   As disclosed in the discussion of Craig-Hallum's "Fairness Opinion" in the Proxy, the $5.60 offer price is below this research valuation.

50.     Craig-Hallum conspicuously omitted forward-looking EBITDA multiples from its analysis despite considering forward-looking revenue and EPS multiples. This inconsistency is particularly notable because the forward-looking EBITDA multiple is often given significant weight by financial advisors in comparable company analyses. Although forward-looking EBITDA estimates were provided by PLATO to Craig-Hallum and used for the discounted cash flow analysis, PLATO does not disclose in the Proxy the estimates it provided to Craig-Hallum.  In fact, it is unusual to use LTM multiples when conducting public comparable company valuation analysis and

it is particularly unusual when the target company's EBITDA has been growing rapidly and where such growth is expected to continue. It may be the case that Craig-Hallum intentionally omitted the forward-looking EBTIDA multiple because it would have supported the conclusion that the Proposed Merger is unfair and undermined the fairness opinion it was paid to provide.

51.     The comparable company analysis excludes many relevant publicly traded companies. The comparable company analysis excludes other software content companies such as Archipelago Learning, Inc and Rosetta Stone, Inc, each of which is commonly considered in PLATO's comparable company universe. The comparable company analysis excludes many other software-as-a-service companies. Examples of such companies include ArcSight, LogMeIn, RightNow Technologies and Verint. These excluded comparable companies have significantly higher LTM EBITDA valuation multiples than the mean and median of the companies included and would have increased those metrics materially.

52.     Craig-Hallum's comparable company analysis implies that Thoma Bravo is not paying a premium for control of PLATO. The analysis includes the selection of nine publicly traded companies put forth as "comparable" to PLATO. This analysis also calculates an EV/LTM EBITDA valuation multiple for PLATO of 10.7x based on the $5.60 per share Proposed Merger price (and an "adjusted" definition of EBITDA as discussed above). Even when considering just the comparable companies selected by Craig-Hallum, PLATO's valuation is only in-line with the comparable companies' median (10.4x) and mean (11.1x) EV/LTM EBITDA valuation multiples implying that Thoma Bravo is *not* paying any premium for control of PLATO.Craig-Hallum's comparable Merger analysis excludes many of the most relevant comparable Mergers - all of which have a higher valuation than the Proposed Merger.   Including these Mergers would have illustrated that the Proposed Merger is unfair. For example, in the educational software sector, CraigHallum's analysis

excludes the February 2010 Merger involving Advent International Corporation, Bain Capital and Berkshire Partners and Skillsoft and the May 2009 Merger involving Blackboard Inc. and ANGEL Learning, Inc., each of which occurred at higher EBITDA valuation multiples than the Proposed Merger. Additionally, Craig-Hallum's analysis excludes many recent Mergers in the software-as-a-service sector. Selected recent Mergers in the software-as-a-service sector include VMWare's acquisition of Springsource announced August 2009 and Autonomy's acquisition of Interwoven Inc. announced January 2009. By including more relevant Mergers in these sectors, the average valuation multiples would imply share prices for PLATO that are far in excess of $5.60 per share.

53.     Even using PLATO's inflated 10.7x EV/LTM EBITDA valuation multiple for the Proposed Merger, the Mergers identified by Craig-Hallum (which exclude several recent related Mergers) imply that the purchase price is too low. Specifically, the median multiple is 10.8x and the mean multiple is 11.3x for the comparable Mergers whereas Thoma Bravo is only paying an EV/LTM EBITDA valuation multiple of 10.7x.

54.     Craig-Hallum's premiums paid analysis on its face also does not support the fairness opinion and illustrates that Thoma Bravo's offer of $5.60 per share is inadequate and unfair. In fact, the premiums paid analysis shows that the mean and median premiums paid in other Mergers is generally substantially higher on a 1-day, 7-day, 30-day, 60-day, and 90-day basis.

55.     In conducting the discounted cash flow analysis for its fairness opinion, Craig-Hallum makes several very questionable assumptions. First, Craig-Hallum uses a 6x to 10x terminal multiple of LTM EBITDA which is low when compared to its own comparable company and comparable Merger median and mean multiples of approximately 10.4x to 11.3x LTM EBITDA and represents an extremely wide range. In addition, this range is not supported by any analysis provided in the Craig-Hallum Fairness Opinion. Second, Craig-Hallum uses an excessively large discount rate of

23% to 27%.   According to common methodologies, such as the capital asset pricing model, PLATO's cost of equity is approximately 13%, far below the rate employed by Craig-Hallum. Moreover, assuming PLATO, which is currently debt free, chooses to access debt capital or was valued based upon an appropriate or target capitalization, PLATO's weighted average cost of capital would likely be reduced due to the lower cost of debt capital. The reevaluation of these two assumptions would likely substantially increase Craig-Hallum's estimated per share equity value for PLATO.

## THE PROXY IS FALSE AND MISLEADING

56.      In an attempt to secure shareholder support for the unfair Proposed Merger, on April 5, 2010, Defendants issued the materially false and misleading Proxy.   The Proxy, which recommends that PLATO shareholders vote in favor of the Proposed Merger, omits and/or misrepresents material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Merger, and the actual intrinsic value of the Company's assets both as a stand-alone entity and as a merger partner for Thoma Bravo.  Specifically, the Proxy omits and/or misrepresents the material information set forth below in contravention of §§14(a) and 20(a) of the 1934 Act:

a.      The Proxy fails to disclose why the Company believes its experience with shopping the Company in 2007 has any relevance to the Proposed Merger and why PLATO failed to contact multiple potential buyers and instead relied on its experience from 2007 (nearly 3 years earlier), to determine that it would not contact any strategic buyers and only five financial buyers.

b.      The Proxy does not identify what criteria were used to select the five financial buyers ultimately contacted by the Company.

c.      The Proxy does not disclose why PLATO's management rejected "Party D's" superior offer out of hand because Party D expected to perform additional due diligence and "because Party D did not appear to understand PLATO Learning's business as well as Thoma Bravo."

d.      The Proxy fails to provide financial projections for fiscal years 2010 to 2014 although Craig-Hallum relies on such projections for its discounted cash flow analysis. This is particularly relevant because the Company's management has stated that [Thoma Bravo] only partner[s] with existing management teams and "[the] [b]ottom line is that our business, our strategy, our leadership team and our mission all remain the same!" Management's operating projections are thus quite meaningful in assessing the value that Thoma Bravo should be expected to pay.

e.      The Proxy fails to disclose why Craig-Hallum used PLATO's LTM trailing revenue and EBITDA numbers to calculate valuation multiples for its comparable company analysis rather than projected revenue and EBITDA multiples. The most important metric for shareholders is the Company's future cash flows and performance, the LTM comparison is of little use to shareholders attempting to determine the fairness of the Proposed Merger.

f.      The Proxy discloses summary statistics for both Craig-Hallum's comparable company and comparable Merger analyses but does not disclose company-by-company or Merger-by-Merger multiples. The failure to disclose this information is particularly relevant since many of PLATO's pricing multiples fall far below the mean and median for both the comparable company and comparable Merger analyses.

g.      The Proxy fails to disclose Greenway's role in the Proposed Merger and the Special Committee.

h.      The Proxy fails to disclose the process utilized by the Company to "conduct a market check of the $5.60 price to determine whether other parties would be willing to pay a higher price."

i.      The Proxy fails to disclose why TWP determined that no additional parties should be solicited and the five financial buyers already contacted were sufficient.

j.      The Proxy does not disclose whether the Special Committee was empowered to enlist its own financial and legal advisors, and if so, why it apparently chose not to enlist such advisors.

k.      The Proxy states that the Company informed bidders that final bids had to be received by February 8, 2010.  However, bidders continued to submit revised bids throughout February.  The Proxy fails to state why such bids were considered.

l.      The Proxy fails to adequately explain the reason that all parties reduced the price per share they were willing to offer after the due diligence investigations.

m.      The Proxy also fails to disclose what was revealed between February 11, 2010 and February 26, 2010, when the Parties conducted due diligence investigations of PLATO that caused one party to request a significant list of due diligence items to be completed.

n.      The Proxy fails to disclose the considerations that factored into the special committee's consideration of the likelihood that each bidder would ultimately close a Merger on the terms offered.

o.      The Proxy states that a major factor in deciding to accept Thoma Bravo's offer was the likelihood that Thoma Bravo "would close the Merger on the terms set forth in the merger agreement."  The Proxy statement fails to explain why Thoma Bravo was more likely to close the Mergers on the terms than other bidders.

p.      The Proxy notes that the special committee approved the selection of both TWP and Craig-Hallum to act as its financial advisors in connection with the potential business combination with Thoma Bravo.  The Proxy fails to disclose, however, why the Committee felt it necessary to engage two financial advisors and incur the substantial costs associated therewith. Further, the Proxy fails to address the Committee's deliberative process, if any, regarding the retention of TWP and Craig-Hallum and whether any other financial advisors were considered.

q.      In addition to the failures to disclose set forth above, the Proxy omits material information concerning the negotiation of the terms of the Proposed Merger as follows:

r.      The Proxy fails to disclose the substance of any negotiations concerning the termination fee provision other than to simply present the $5,800,000.00 fee as a potential risk that could negatively impact PLATO's stock price.  The Proxy should disclose why PLATO agreed to pay such a termination fee

s.      The Proxy fails to disclose the substance of any negotiations concerning the non-solicitation provision or why such a provision is necessary or desirable.

57.      The Individual Defendants were aware of their duty to disclose the foregoing material information in the Proxy, and acted with at least negligence in failing to ensure that this material information was disclosed in the Proxy.  Absent disclosure of this material information, shareholders are unable to make an informed decision whether to vote in favor of the Proposed Merger, and are thus threatened with irreparable harm.

## COUNT I

### (Against Defendants for Violations of 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder)

58.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     During the relevant period, Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

60.     The Proxy was prepared, reviewed and/or disseminated by Defendants.   It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Merger, and the actual intrinsic value of the Company's assets as stand-alone and as a merger partner for Thoma Bravo.

61.     In so doing, Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company, Defendants were aware of this information and of their duty to disclose this information in the Proxy.

62.     Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.  The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy Statement and in other information reasonably available to shareholders.

63.     By reason of the foregoing, Defendants have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

64.     Because of the false and misleading statements in the Proxy, Plaintiff is threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT II

### (Against Defendants For Violation of §20(a) of the 1934 Act)

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of PLATO within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of PLATO, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.

67.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular Proposed Merger giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in the making of this document.

69.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing and approving the Proposed Merger. The

Proxy purports to describe the various issues and information that they reviewed and considered, descriptions which had input from the Board..

70.    Moreover, pursuant to §5.6 of the Agreement and Plan of Merger, the Individual Defendants each have the duty individually to discover and correct any material misstatement or omission of material fact, which they have failed to do.  By virtue of the foregoing, the Individual Defendants have violated §20(a) of the 1934 Act.

71.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands relief, in Plaintiff's favor against Defendants, as follows:

A.    Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Merger, unless and until they comply with their duties under §§14(a) and 20(a) of the 1934 Act to provide shareholders with all material information about the unfair sales process for the Company,  the unfair consideration offered in the Proposed Merger, and the actual intrinsic value of the Company's assets both as a stand-alone entity and as a merger partner of Thoma Bravo.

B.    Rescinding, to the extent already implemented, the Proposed Merger or any of the terms thereof;

C.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

D.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  April 15, 2010                    **ZIMMERMAN REED, P.L.L.P.**

Carolyn G. Anderson, No. 275712
Kirsten D. Hedberg, No. 344369
651 Nicollet Mall, Suite 501
Minneapolis, MN  55402
Telephone:  612.341.0400
Facsimile:  612.341.0844
Carolyn.Anderson@zimmreed.com
Kirsten.Hedberg@zimmreed.com

David A.P. Brower
BROWER PRIVEN
 A Professional Corporation
488 Madison Avenue, 8th Floor
New York, NY  10022
Telephone:  212.501.9000
Facsimile:  212.501.0300

Charles J. Priven
Yelena Trepetin
BROWER PRIVEN,
 A Professional Corporation
1925 Old Valley Road
Stevenson, MD  21153
Telephone:  410.332.0030
Facsimile:  410.685.1300

*Attorneys for Plaintiff*